UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THERMION, INC.,

       Plaintiff,

    v.

THERMION METALIZING SYSTEMS,
LTD.,

       Defendant.

Case No. C05-5409FDB

ORDER GRANTING CERTAIN
PRELIMINARY INJUNCTIVE
RELIEF TO DEFENDANT AND
DENYING PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION

## INTRODUCTION

This cause of action arises primarily under the United States trademark laws, 15 U.S.C. §

1051 *et seq.*  Plaintiff pleads seven counts, which include (1) trademark and service mark

infringement, (2) trade name infringement, (3) common law trademark infringement, (4) false

designation of origin and description of fact, (5) violation of the Washington State Consumer

Protection Act, (6) unfair competition and trade dress infringement, and (7) breach of contract.  The

Court has federal question jurisdiction over the trademark claims and supplemental jurisdiction over

the state claims.

Both parties are Washington corporations with their principal places of business in Silverdale,

Washington, both parties allege that they do their business throughout the United States. and both

ORDER - 1

1   parties' businesses involve metalizing or twin wire arc spray systems.  Plaintiff alleges that it designs,

2   manufactures, sells, and services these systems, and Defendant alleges that it designs, assembles,

3   sells, and services these systems.

4         The alleged trademark ownership and usage rights, contract rights, and fiduciary duties

5   derive from an approximate twenty-year relationship between Plaintiff and Defendant where "few, if

6   any, agreements were reduced to writing."  (Joint Status Report, p. 3.)

7         Plaintiff alleges that this matter arose when Plaintiff, the manufacturer of arc spraying

8   machinery, attempted to end a long-term relationship with its distributor – Defendant – "which had

9   entered into a partnership with a large competitor of Plaintiff."  *Id.*  Plaintiff also alleges that

10   Defendant is using Plaintiff's marks, products, patents, good will, and other proprietary information

11   inappropriately and without authorization.

12         Defendant counterclaims alleging that it owns the Thermion trademark and that Plaintiff has

13   misappropriated the goodwill associated with the mark, causing confusion among Defendant's

14   customers and distributors, that Plaintiff has been unfairly competing with Defendant, its exclusive

15   distributor, by selling directly to Defendant's customers, and that Plaintiff's trademark registration

16   was fraudulently obtained and should be cancelled.  Defendant also alleges trademark and service

17   mark infringement, tortious interference with contractual relations, tortious interference with

18   business expectancy, breach of fiduciary duties, and violations of the Washington Consumer

19   Protection Act.  Defendant seeks a declaratory judgment that Defendant owns the Thermion

20   trademark and that Plaintiff's trademark registration was fraudulently obtained and should be

21   cancelled.

22         This matter is presently before the Court on cross-motions for a preliminary injunction.

23                 **PRELIMINARY INJUNCTION STANDARD**

24         To obtain a preliminary injunction, the moving party must show either (1) a combination of

25   probable success on the merits and the possibility of irreparable injury or (2) that serious questions

26   ORDER - 2

1   are raised and the balance of hardships tips in its favor.  *Benda v. Grand Lodge of the Int'l Ass'n of*

2   *Machinists & Aerospace Workers*, 584 F.2d 308, 314-15 (9th Cir. 1978), *cert. dismissed*, 441 U.S.

3   937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979); *see also, Sega Enterprises LTD. v. Accolade, Inc.*, 977

4   F.2d 1510 (9th Cir. 1992).  These two formulations represent two points on a sliding scale in which

5   the required degree of irreparable harm increases as the probability of success decreases.  *Oakland*

6   *Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985), *Accord, United*

7   *States v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992).

8       To demonstrate a likelihood of success on the merits in a trademark action, a party seeking

9   injunctive relief must prove (1) ownership of a valid trademark, and (2) a likelihood that the allegedly

10  infringing mark will be confused with its own mark.  *Omega Nutrition v. Spectrum Marketing*, 756

11  F. Supp. 435, 437 (N.D. Cal. 1991).

12                      **DISCUSSION OF RESPECTIVE CLAIMS**

13      It cannot be doubted that Plaintiff's and Defendant's use of the Thermion mark in the market

14  for metalizing or twin wire arc spray systems generates confusion, and both parties agree that there is

15  a likelihood of confusion by Plaintiff's and Defendant's use of the Thermion mark.

16      To avoid confusing references to the parties' names, which both contain the word

17  "Thermion," further references to Plaintiff Thermion, Inc. will be to TINC and to Defendant

18  Thermion Metalizing Systems, Ltd. will be to TMS.

19      The likelihood of confusion being a given in this case, the remaining question is who is the

20  rightful owner of the Thermion mark.

21      Under the Lanham Act, a federally registered mark is prima facie evidence of the registrant's

22  ownership of the mark.  15 U.S.C. §§ 1057(b) and 1115(a) (1982 & Supp. 1990).

23      Plaintiff TINC claims ownership of "U.S. Trademark Registration No. 2,871,557 for the

24  mark THERMION and Design" for use with its metalizing process, registered August 10, 2004

25  based on a first use in 1990.  (Frank Rogers Decl. ¶ 4.)  TINC also claims ownership of pending U.S.

26  ORDER - 3

1   Trademark Office application to register the word mark THERMION in connection with sprayers

2   and other equipment. (*Id.* ¶ 5.)

3          ***Defendant TMS's Evidence Rebutting TINC's Ownership Claim***

4          Defendant TMS must rebut the presumption of Plaintiff TINC's ownership by a

5   preponderance of the evidence. *Omega Nutrition v. Spectrum Marketing*, 756 F. Supp. 435, 437-38

6   (N.D. Cal. 1991).

7          Defendant TMS asserts first use of the THERMION word and design marks.  TMS contends

8   that it began using the THERMION mark in connection with the sale of goods in 1988 and has been

9   using it virtually exclusively for over fifteen years.  Defendant TMS also asserts that in addition to

10  being the first to affix the mark to the product, TMS's name has consistently appeared with the

11  trademark on the product and in trade show displays and advertising over the past eighteen years;

12  that TMS has maintained the quality and uniformity of the product, made customer warranties,

13  serviced many of the products it sold, and participated in certifying the product to meet international

14  standards.

15         In its statement of facts (referencing attendant declarations), TMS contends that Frank

16  Rogers founded TINC, which designed and manufactured metalizing equipment, and Mahlon Wixson

17  founded TMS, which marketed and sold TINC's metalizing equipment on an exclusive basis, along

18  with other metalizing accessories.  TMS contends that Mahlon Wixson's long work in the field,

19  creating and maintaining business and sales contacts developed the THERMION name as a

20  trademark, which TMS now exclusively owns.  TMS contends that while TINC operated as

21  Thermion Arc Systems (TASCO) from 1982 to about 1987 and sold some metalizing equipment,

22  that equipment was not labeled, packaged, sold, or displayed with the THERMION trademark.

23  (David Wixson Decl. ¶ 5.)  The operator manual referred to the product as the "TASCO arc spray

24  gun." (D. Wixson Decl. ¶ 7.)

25         TMS contends that in 1987, Mahlon Wixson and Frank Rogers verbally agreed that Wixson

26  ORDER - 4

1   would exclusively market, sell, and distribute the TASCO spray machines.  Then in 1988, Wixson

2   hired his daugher, Yvette Wixson, to design marketing materials and a logo for the company. Yvette

3   Wixson created a dragon logo and later – in about April or May 1990 –  a "long T" logo for

4   THERMION as used in Thermion Metalizing Systems (the top of the "T" in Thermion is stretched

5   over the top of the other letters in the word.).  (Y. Wixson Decl. ¶¶ 5, 13, 14.)    TMS contends that

6   it first marked equipment with the THERMION logo designed by Yvette Wixson when Mahlon

7   Wixson purchased the first labels in around 1991.  (D. Wixson Decl. ¶ 13.)  TMS asserts that it

8   stands behind the quality of the products it delivers under the THERMION mark, and cites a legal

9   claim that arose from an explosion at a coatings facility using TINC's machines, and that TINC

10   tendered the defense of the claim to TMS.  (D. Dixson Decl. ¶ 24.)

11       Defendant TMS points out that with respect to Plaintiff TINC's registration of the "long T"

12   THERMION design mark, TINC originally claimed first use in 1980, but later amended its claim to

13   first use as of January 31, 1990.  TMS contends that such first use by TINC is impossible, because

14   the design was not developed in its final form by Yvette Wixson until later 1990 and 1991.  (Y.

15   Wixson Dec. ¶¶ 13, 14.)  TMS is seeking to have TINC's U.S. Registration No. 2,871,557 (Design

16   Mark) and U.S. Application Serial No. 78/682,643 (Word Mark) cancelled, and if granted, TMS

17   would apply to register the Design and Word marks with different dates of first use and a different

18   identification of goods and services, and would not agree to disclaim the word "Thermion," since

19   that term is distinctive when used in connection with TMS's goods and services.  (J. Simmons Decl.

20   ¶ 7)  Defendant TMS also points out that on February 11, 2004, Plaintiff TINC specifically

21   disclaimed the exclusive right to use the word "thermion" in response to a U. S. Patent and

22   Trademark Office action declaring that term descriptive on September 9, 2003:  "The applicant's

23   goods use thermions, ["an electrically charged particle, especially an electron, emitted by a

24   conducting material at high temperatures"] therefore, the mark describes a feature of the goods." (S.

25   Simmons Decl. Exs. B and C.)

26   ORDER - 5

1

### *Plaintiff TINC's Reply in Support of Its Ownership Claim*

2      TINC submits that beginning with the first machine built in 1982, Frank Rogers personally

3 affixed the THERMION mark to the back and top of each machine by hand, using individual letter

4 stickers, and that between 1982 and 1988, before any involvement with Mahlon Wixson, TINC sold

5 eight machines.  (Frank Rogers Supp. Decl. ¶ 2.)

6      TINC argues that while it is true that a trade name cannot be registered with the U.S.

7 Trademark Office, a trade name is protectable against confusing use by another, since trade names

8 often function as trademarks or service marks as well.  Lanham Act. 15 U.S.C.A. § 1125; RCW §

9 19.86 *et seq.*  TINC asserts that it is not disputed that Frank and Rosanna Rogers of Thermion Arc

10 Systems Co. originated the THERMION name as early as 1982.  (Decls. Of Frank and Rosanna

11 Rogers.)  Upon incorporation, the Thermion Arc Systems Co. name carried over into the present

12 Thermion, Inc. business name, which was registered with the State of Washington on June 1, 1995.

13 (F. Rogers Supp. Decl. ¶ 8.).

14      TINC asserts that in 1988 it entered into an agreement with Mahlon Wixson for TMS to

15 market and sell specific THERMION machines, and TMS was permitted to use the THERMION

16 name and mark in connection with the marketing and sale of the specified machines by an oral

17 license.  (F. Rogers Supp. Decl. ¶ 3.)   TINC asserts that it was responsible for product quality.  *Id.* ¶

18 8.)  Frank Rogers Supp. Declaration lists other things that TINC took responsibility for, such as

19 editing sales materials for Mahlon Wixson and drafting owner's manuals.  *Id.* ¶ 13, 14.

20     ### *Defendant TMS's Reply*

21      TMS sums up TINC's showing as mere trade name usage of a descriptive term that has had

22 insufficient use by TINC to acquire secondary meaning.  On the other hand, Mahlon Wixson's efforts

23 on behalf of TMS in advertising the brand extensively,  participating at trade shows and in industry

24 groups to promote the THERMION brand over an eighteen year period created secondary meaning

25 and value that now inheres in the THERMION mark.  TINC's invoices, purchase orders, and its

26 ORDER - 6

operator manual show the product being referred to as the "TASCO arc spray machine" and the "Model A." (F. Rogers Supp. Decl., Exs. C and H.) While TINC sold eight machines from 1982 to 1988, TMS sold approximately 380 machines from 1989 to 2004. TMS sets forth a chart of TINC's and TMS' activities through the years with respect to the mark. (TMS Reply p. 3.)

TMS argues that TINC's showing is insufficient to show priority of use of the THERMION mark because of the eight items of generic equipment that TINC sold between 1982 and 1988, the sales are indicated by purchase orders generated by the buyers, and only four were sold in interstate commerce. (F. Rogers Supp. Decl. ¶ 1.) At most, TINC shows *de minimus* use of the mark, citing J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition*, § 16.9 ("To establish ownership of a mark, the prior user must establish not only that at some date in the past it used the mark, but that such use has continued to the present. Such a continuous use implies something more than mere sporadic or de minimis sales."

TMS draws attention to the 1994 photograph submitted by TINC showing the THERMION mark that Frank Rogers claims to have personally affixed to the machine. (F. Rogers Supp. Decl. ¶ 2, Ex. A.) TMS asserts that the label depicted in the 1994 photograph was actually one of the number plates purchased by Mahlon Wixson in May 1989 from MetalCraft. (D. Wixson Supp. Decl. ¶ 6, Ex. B, copies of plate and packing slip.) Mahlon Wixson's son explains that the first serial number was 50001 (representing Model 500, number 01). (D. Wixson Supp. Decl. ¶ 6) TMS notes that the plate in the 1994 photograph bears serial number 048, indicating a time later than May 1989.

TMS argues that as a dealer, it can apply THERMION as its dealer mark (*See McCarthy*, § 16.46 ("It is clear that one need not actually manufacture goods in order to acquire and own a valid trademark for the goods.") and that it does have products of its own on which to use the mark. (D. Wixson Supp. Decl. ¶ 9.)

TMS disputes that it was an agent or licensee of TINC, which has the burden on this issue.

ORDER - 7

1  Under Washington law, "the burden of establishing an agency rests upon the one who asserts it."

2  *Moss v. Vadman*, 77 Wn.2d 396, 402-03 (1969)("[A] prerequisite of an agency is control of the

3  agent by the principal."  TMS submits that there is no evidence to support TINC's agency theory.  In

4  fact, TINC's documentary evidence shows references to Mahlon Wixson as his "business partner"

5  and referred to the two companies as joint venturers.  (D. Wixson Decl. ¶¶ 9 and 10, and Exs. D, E.

6  And F.)  TINC states that it only recently discovered that TMS had revised TINC's operator

7  manuals in the early 1990s and replaced TINC's contact information with TMS' information. (F.

8  Rogers Supp. Decl. ¶ 15.)  If so, concludes TMS, it clearly did not exercise control over TMS and its

9  use of the mark.  TMS submits that it held itself out to the public as THERMION for eighteen years

10  with no complaint from TINC.

11        TMS contends that it was TINC's independent, exclusive distributor, citing a November 20,

12  1996 letter from Frank Rogers to Alberta Power Ltd., wherein he stated: "As I mentioned on the

13  phone, all Thermion equipment is sold by Thermion Metalizing Systems Ltd.  You would send your

14  purchase order directly to them.  Their fax number is 360-698-1539 phone 360-692-6656, Dave or

15  Mahlon Wixson."  (D. Wixson Supp. Decl. ¶ 11 and Ex. G.)

16                              **ANALYSIS & CONCLUSION**

17        It is the actual use of a designation as a mark that creates rights and priority over others.  J.

18  Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition*, § 16.1.  "Constructive

19  use" priority, obtained by filing an application for federal registration, "can always be defeated by

20  another party's evidence of a prior actual use."  *Id.*  "Neither application for, nor registration of, a

21  mark at the federal level wipes out the prior non-registered, common law rights of others.  The non-

22  registered rights of a senior user continue and are not trumped by the later federal registration by a

23  junior user.  *Id.* §§ 16.2, 16.18, 16.18.1.

24        "Inherently distinctive marks," those that are so distinctive in and of themselves that legal

25  protection is granted immediately upon adoption and use, such as fanciful and arbitrary marks, do

26  ORDER - 8

not require secondary meaning for protection., *2 McCarthy*, § 16.3, and ownership of such marks is governed by priority of use. *Id.* § 16.4. A manufacturer may establish priority in a mark by using it in sales to a distributor. *Id. § 16.5. De minimis* use may not be sufficient to achieve priority of use. *Id. 16.6.* Use of the mark must also be in a bona fide sale and not an intra-corporate, non-arms length business transaction. *Id. 16.7.*

> A distributor as well as a manufacturer may acquire a valid trademark for the goods.
>
> That is, one who only distributes good made by another can be the "owner" of a trademark which the distributor places on the goods to identify the distributor. This type of mark is known as a "dealer's mark" or a merchant's mark."

*Id.* § 16.46. Also, "... a single product may properly bear both a manufacturer's mark and a merchant's mark, so long as the separate identifying function of each mark is clear to customers." *Id. §* 16.48.

*McCarthy* goes on to discuss trademark ownership as between manufacturer and dealer and notes at the outset: "A dispute as to trademark ownership between a manufacturer and a distributor often presents difficult problems." *Id.* § 16.48. Two situations are noted: (1) where a manufacturer owns a mark and enters into a distribution relationship with the dealer where the dealer does not acquire rights in the goods it distributes; (2) when a dealer buys goods from a manufacturer and applies his own "merchant's mark" to the goods, the dealer, not the manufacturer, is the owner of such a trademark. *Id.* In either situation, the key issue is who was the initial owner of the mark. *Id.* Where there is a contract, both contractual expectations and consumer perception must be considered. *Id.* If there is no contractual provision for ownership of the disputed mark, a court must weigh factors such as the following:

1. Which party invented or created the mark.
2. Which party first affixed the mark to goods sold.
3. Which party's name appeared on packaging and promotional materials in conjunction with the mark.
4. Which party exercised control over the nature and quality of goods on which the mark appeared.
5. To which party did customers look as standing behind the goods, e.g., which party

received complaints for defects and made appropriate replacement or refund.

6.    Which party paid for advertising and promotion of the trademarked product.

*McCarthy* § 16.48.

**1. Which party created the mark:**

TINC asserts that Frank and Rosanne Rogers found the word in the dictionary and originated the THERMION name as early as 1982 when the company was known as Thermion Arc Systems Co. (TASCO) and carried over to its present business name Thermion, Inc.  TINC cites its registration of the THERMION design mark (August 10, 2004 based on first use in 1990) and its pending registration of the word mark THERMION in connection with sprayers and other equipment.

TMS asserts that Yvette Wixson designed the dragon logo in about 1989 and the "long T" logo for THERMION for TMS' use in about April or May 1990.

TINC disclaimed exclusive right to use the word "thermion" after the U.S. Patent and Trademark Office declared that term descriptive on September 9, 2003 because it describes a feature of TINC's goods that use thermions.  Thus, while TINC may use "thermion" in its business name, the assertion that Yvette Wixson created the dragon logo and the "long T" logo for TMS has not been rebutted.  This factor favors TMS.

**2. Which party first affixed the mark to goods sold:**

TINC asserts that beginning with its earliest sales of arc spraying equipment (1982 – 1988), Frank Rogers personally affixed the THERMION mark to the machines, and submits a 1994 photograph.  TINC asserts that all of its machinery has consistently been marked with the manufacturer's label bearing the THERMION mark and that TMS has never disputed that it used the THERMION mark pursuant to a verbal license from TINC that was terminable at will.

TINC, however, has never proven that such a verbal license ever existed.

TMS submits evidence that it, through Mahlon Wixson, in May 1989 purchased the

ORDER - 10

1   numberplates from MetalCraft and began labeling the product in the manner shown in the 1994

2   photograph.  The labels show the name THERMION, and beneath that the words "Manufactured by

3   Thermion Arc Systems," and a serial number.  The serial number in the 1994 photo indicates a date

4   later than 1988, a date later than TINC's eight sales between 1982 and 1988.  Photographs of the

5   early system from TINC (then TASCO) show that the equipment was unmarked.  (D. Wixon Decl. ¶

6   5, Ex. A; and see Ex. I (April 1989 issue of *Metallinze* showing unmarked "Thermion 500 Arc Spray

7   System.") This factor favors TMS.

8       **3.   Which party's name appeared on packaging and promotional materials in conjunction
            with the mark:**

9

10      TINC asserts that it affixed the THERMION mark to the machines it sold in the 1982 - 1988

11  period, and that from 1988-2005, with the priority of ownership of the THERMION trade name and

12  trademark clearly established, it permitted TMS to use the THERMION name and mark in

13  connection with the marketing and sale of the THERMION 500 machine and later the THERMION

14  500M arc spray system.  (F. Rogers Supp. Decl. ¶ 3)  TINC asserts that it permitted the mark to be

15  used in connection with the Bridgemaster, the Spraymaster and Metalizer systems.  (*Id.* ¶¶ 3 and 5.)

16  TINC asserts that TMS had no products of its own that it could legitimately label THERMION.

17  TINC asserts that it edited marketing and sales materials.  (F. Rogers Decl. ¶¶ 10, 13.)

18      TMS submits evidence that Mahlon Wixson attended trade shows, among other things, and

19  cites Dave Wixson's Declaration, Exhibits N, O, and P, which provides a sampling of some of

20  TMS's product promotion activities, including brochures and advertising.   TMS has made a

21  showing greater than TINC's mere assertion of editing and unsubstantiated oral agreement giving

22  TMS permission to use the mark.  TMS asserts that it has developed or is currently developing its

23  own metalizing systems to sell under the THERMION name, including the Handi-Arc, the

24  Bridgemaster (U.S. Registration No. 2,677,300, (Simmons Decl. ¶ 8.), and others.  (D. Wixson,

25  Supp. Decl. ¶ 9.)  This factor favors TMS.

26  ORDER - 11

**4. Which party exercised control over the nature and quality of goods on which the mark appeared:**

TINC asserts that as manufacturer of the products it necessarily assumed responsibility for the quality and uniformity of its products.  ( F. Rogers Supp. Decl. ¶¶ 3, 6-8.)

TMS asserts that it insured the quality of the products delivered under the THERMION brand.  (TMS Response, p. 6.)

Both parties make a weak showing on this factor, and it favors neither party.

**5. To which party did customers look as standing behind the goods, e.g., which party received complaints for defects and made appropriate replacement or refund:**

TINC asserts that it stood behind its goods and refers to the 1997 accident in Houston. TINC states that it tendered no claim regarding this accident to TMS, and that when OSHA requested that TINC as the manufacturer of the machines provide for an examination of the equipment, Frank Rogers and a third-party mechanic traveled to the accident site to inspect the machines at issue and that TMS had no significant involvement.  (F. Rogers Supp. Decl. ¶ 18.)

TMS asserts that regarding the 1997 Houston accident, a subpoena was addressed to Thermion Metalizing (TMS) but sent to TINC's address, and Frank Rogers signed for the letter, which was sent by certified mail.  (D. Wixson Supp. Decl., ¶ 19, Ex. N.)

Neither party makes a significant showing on this factor, and the mail sent to one party at the other's address simply demonstrates confusion.  This factor favors neither party.

**6. Which party paid for advertising and promotion of the trademarked product:**

It appears that around June 2004, TINC began using its website to advertise factory direct sales and that TINC's first magazine advertisement appeared in *Coatings Pro,* in the Spring of 2005. (D. Wixson Decl. ¶ ¶ 30, 32.)

TMS, however, has provided evidence of its advertising since 1988 and expenditure of nearly $100,000 on advertising from 1996 to 2001.  (D. Wixson Supp. Decl. ¶ 4, Ex. A.)  This factor favors TMS.

ORDER - 12

1    Concluding that TMS created the design mark THERMION with the "long T" and that TINC

2    is not entitled to exclusive use of the word "thermion"; that TMS first affixed the THERMION mark

3    to the goods; that TMS used the mark extensively in promotional materials; and that TMS made the

4    greater expenditure related to advertising since 1988; TMS has made a sufficient showing of

5    likelihood of success – that is, a showing of ownership of a valid trademark – to defeat TINC's

6    showing on these cross-motions for summary judgment and to obtain the preliminary injunction that

7    it seeks.

8    The next question is what should be preliminarily enjoined.

9    TINC is not entitled to exclusive use of the word "thermion."  Neither is TINC entitled to use

10   the graphic design THERMION with the elongated T described in Yvette Wixson's declaration.

11   TMS urges the Court to find a long-term, exclusive marketing and distribution agreement for

12   the sale of thermal metalizing equipment between the parties, which they began performing in 1988.

13   On the record submitted, the Court cannot make such a finding.

14   TMS is entitled to exclusive use of the design THERMION with the elongated T described in

15   Yvette Wixson's declaration.

16   NOW, THEREFORE,

17   IT IS ORDERED:

18   1. Defendant/Counterclaimant TMS's Cross-Motion for A Preliminary Injunction [Dkt. #

19   36] is GRANTED as follows:

20   a. Plaintiff Thermion, Inc. (TINC, *supra*) is not entitled to exclusive use of the word

21   "thermion" and is restrained from any attempt to enforce such entitlement;

22   b. Defendant/Counterclaimant Thermion Metalizing Systems, Ltd. (TMS, *supra*) is

23   entitled to exclusive use of the design THERMION with the elongated T described in Yvette

24   Wixson's declaration.

25

26   ORDER - 13

2.  Defendant/Counterclaimant Thermion Metalizing Systems, Ltd. shall post a bond with the Court in the amount of $5,000.00 within ten days of the entry of this order.

3.  Plaintiff Thermion, Inc.'s Motion for Preliminary Injunction [Dkt. # 30] is DENIED.

DATED this 21st day of March, 2006.

FRANKLIN D. BURGESS
UNITED STATES DISTRICT JUDGE

ORDER - 14